# In the United States District Court
# for the Southern District of Georgia
# Savannah Division

MARLON J. BROWN,

    Plaintiff,

    v.

MSC SHIP MANAGEMENT, LTD.,
MSC MEDITERRANEAN SHIPPING
CO., and MERIDIAN 7 LTD.,

    Defendants.

4:23-CV-182

## ORDER

Before the Court is Defendants' motion for summary judgment. Dkt. No. 27. The motion has been fully briefed and is ripe for review. Dkt. Nos. 27, 28, 42, 43, 49, 59. The Court heard oral argument on June 6, 2025. Dkt. No. 66. For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises out of a slip-and-fall on the gangway of a ship. Dkt. No. 1-1 ¶ 16. On October 9, 2022, Plaintiff Marlon Brown slipped and fell on the last few steps of a ship's gangway while it was docked in the Port of Savannah, Georgia. Id. ¶¶ 14, 16. MSC Ship Management, Ltd., MSC Mediterranean Shipping Co., and Meridian 7 Ltd. ("Defendants") collectively own and operate the ship upon which Plaintiff fell, the M/V MSC Gayane. Id. ¶ 14.

Plaintiff is a longshoreman; specifically, Plaintiff worked as a lasher[1] on the day of his fall. Id. ¶ 12, Dkt. No. 27-3 at 5, 17:25–18:4. That day was no different from a typical day at the Port, where Plaintiff had worked for roughly seven years. Id. at 4, 15:17–23. After a safety meeting with his longshoremen crew on the pier, Plaintiff ascended the gangway of the vessel between 7:00am and 7:15am. Id. at 6, 24:5–10. Forty-five minutes later, Plaintiff disembarked the ship and descended the gangway with a lashing tool in his hand. Id. at 7, 26:22.

While walking down the gangway stairs, Plaintiff slipped near the bottom of the gangway. Dkt. No. 27-2 at 0:05–0:16. Plaintiff attempted to grab the rope, which extends from the gangway's handrail, but "it was too loose for him to grab as support." Dkt. No. 42-1 ¶ 12. As he fell, Plaintiff's leg twisted, and he tore his quadricep muscle. Dkt. No. 27-3 at 13, 49:7–16. The fall is memorialized on two videos. Dkt. Nos. 27-2, 71.

Plaintiff attributes his fall to two hazardous conditions: (1) the lack of traction on the lower stairs of the gangway due to wear and tear and (2) the tautness of the rope handline at the end of the metal handrail. See Dkt. No. 42. Meanwhile, Defendants fault

---

[1] A lasher is a longshoreman who fastens and loosens shipping containers and cargo for loading and unloading. Dkt. Nos. 27-1 at 6, 27-3 at 18:2–4.

Plaintiff for carrying a lashing tool in his hand while "jogging" down the gangway. See Dkt. No. 27.

A medical team took Plaintiff away in an ambulance at approximately 8:40am to examine his injuries. Dkt. No. 42-3 at 1. Plaintiff had surgery for his torn quadricep. Id. at 13, 49:17-19. He also suffered lower back pain. Dkt. No. 27-3 at 13, 51:17-22. About seven months after the fall, Plaintiff returned to work as a longshoreman. Dkt. No. 43 ¶¶ 17-18. Plaintiff brought this lawsuit on May 16, 2023, alleging that Defendants—the shipowners—were negligent. Dkt. No. 1-1. Defendants removed the case to federal court. Dkt. No. 1. At this time, Defendants move for summary judgment. Dkt. No. 27.

## LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the "party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings." Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990). "Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 1576–77.

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

## DISCUSSION

Genuine, but narrow, issues of material fact persist in this case. Before addressing the factual disputes, however, the Court first discusses the substantive law underlying Plaintiff's claim.

## I.    **Vessel Negligence under the Longshore Act**

Plaintiff brings this one-count negligence action pursuant to the Longshore and Harbor Workers' Compensation Act ("the Longshore Act"). 33 U.S.C. § 905(b). The Longshore Act provides a statutory negligence action against the vessel itself and gives longshoremen a right to recover from the shipowner. Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 165 (1981). In Scindia, the U.S. Supreme Court defined the scope of this statutory duty owed by a vessel:

> [A]bsent contract provision, positive law, or custom to the contrary[,] . . . the shipowner has no *general* duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.[2] The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. . . . The shipowner, within limits, is entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations.

Id. at 172 (emphasis added). Thus, through the Longshore Act, "Congress intended to make the vessel answerable for its own

---

[2] The stevedore is the "person or company that hires longshore and harbor workers to load and unload ships." Stevedore, Black's Law Dictionary (12th ed. 2024). The Longshore Act contemplates that, "in most instances, an independent stevedore" employed the injured longshoreman and establishes a separate statutory scheme for the stevedore-employer to pay benefits for work-related injuries and death regardless of fault. Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994) (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 263–64 (1979); 33 U.S.C. §§ 904, 905(a)).

negligence" but *not* for injuries arising out of "conditions caused by the negligence or other defaults of the stevedore." Id. at 168.

The Scindia Court delineated the three duties (hereinafter "the Scindia duties") that remain with the vessel: "(1) the turnover duty, (2) the active control duty, and (3) the duty to intervene." Miller v. Navalmar (UK) Ltd., 685 F. App'x 751, 755 (11th Cir. 2017) (citing Howlett, 512 U.S. at 98). Plaintiff contends Defendants breached all three duties and were, therefore, negligent. See Dkt. No. 42.

Once a plaintiff establishes that the vessel owed a duty of care, the Longshore Act rests on the "accepted principles of tort law" and requires the plaintiff to show a breach of that duty, causation, and injury. Scindia, 451 U.S. at 166; Willis v. Royal Caribbean Cruises, LTD, 77 F.4th 1332, 1336 (11th Cir. 2023) (Maritime tort cases, "of course, require a plaintiff to show that '(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm.'" (quoting Chaparro v. Carnival Corp., 693 F.3d 1333, 1336 (11th Cir. 2012))); see also In re Knudsen, 710 F. Supp. 2d 1252, 1268–69 (S.D. Ala. 2010) ("[T]he contours of a vessel's duty to longshoremen are 'left to be resolved through the "application of accepted principles of

tort law and the ordinary process of litigation."'" (quoting _Scindia_, 451 U.S. at 165-66)).[3]

## II. **The _Scindia_ Duties**

First, Plaintiff proposes that this case involves the exception to _Scindia_, arguing that, in this case, a contrary "contract provision, positive law, or custom" imposes a "general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations," and Defendants breached that general duty. 451 U.S. at 172 (This general duty does not arise "absent contract provision, positive law, or custom to the contrary."); Dkt. No. 42 at 8. Second, and alternatively, Plaintiff posits that a reasonable jury could find that Defendants breached each of the three specific _Scindia_ duties, resulting in Plaintiff's injury. Dkt. 42 at 10, 15, 19.

Defendants move for summary judgment and argue that Plaintiff raises design defect claims, which are not cognizable under _Scindia_. Dkt. No. 27 at 13. Alternatively, Defendant argues that even if Plaintiff's claims fall under one of the _Scindia_ duties, summary judgment is warranted because the alleged dangerous

---

[3] Although _Willis_ itself is not a Longshore Act case, the Eleventh Circuit recently confirmed that its causation holding applies with full force to vessel negligence under the Longshore Act and _Scindia_. _See_ Roberts v. Phila. Express Tr. Hapag-Lloyd USA, LLC, No. 24-10957, 2025 WL 671923, at *2 (11th Cir. Mar. 3, 2025) (per curiam).

condition (1) is not a breach, (2) was an open and obvious hazard, and (3) was not the proximate cause of Plaintiff's injury. Id. at 16, 23. The factual disputes center on (1) whether the tread on the gangway steps was worn, (2) whether the rope handline was taut, and (3) whether Plaintiff jogged down the gangway. The Court addresses each argument in turn.

### A. Plaintiff Does Not Seek Recovery for Breach of the Warranty of Seaworthiness.

A brief note on the legislative history of the Longshore Act is a helpful and necessary backdrop to Defendants' first argument. Congress amended the Longshore Act in 1972. See 33 U.S.C. § 905(b). "Prior to 1972, a longshoreman injured while loading or unloading a ship could receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence." Scindia, 451 U.S. at 164 (citing Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946)). "Proof of unseaworthiness required no proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel" even if "the condition was caused, created, or brought into play by the stevedore or its employees." Id. at 164-65. Under the 1972 Amendments, however, "the longshoreman's right to recover for unseaworthiness was abolished." Id. at 165; see also 33 U.S.C. § 905(b) ("The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.").

Accordingly, courts hold that a design defect claim, disguised as a negligence action, improperly challenges the seaworthiness of the vessel. See, e.g., Davis v. United States, 827 F. Supp. 1576, 1582 (S.D. Ga. 1993) ("A claim for negligent design is merely another way of alleging that the ship was unseaworthy." (citing Bilderbeck v. World Wide Shipping Agency, 776 F.2d 817, 819 (9th Cir. 1985))); Anastasiou v. M/T World Tr., 338 F. Supp. 2d 406, 418 (E.D.N.Y. 2004) ("A claim for negligent design is merely another way of alleging that the Vessel was unseaworthy."); Weinlein v. Anapa Shipping Ltd., No. 12-4625, 2015 WL 760712, at *5 (D.N.J. Feb. 20, 2015) ("Although plaintiff attempts to color his claim as one sounding in negligence (which cause of action is permitted against a vessel owner), the crux of his claim is a design defect of the ladder. A claim of improper design or design defect is essentially a claim for unseaworthiness."); Griffin v. Chembulk Mar., No. 19-9793, 2020 WL 6582242, at *2 (E.D. La. Nov. 10, 2020) (dismissing claim that "the gap into which Plaintiff stepped has existed since the construction of the vessel" as a design defect but allowing claim that "[d]efendants were negligent in failing to fix the gap or warn him of the gap prior to beginning his work" to proceed under the turnover duty); Denson v. Ingram Barge Co., No. 5:07-CV-00084, 2009 WL 2447930, at *3 (W.D. Ky. Aug. 6, 2009) (Where the plaintiff's claim "could possibly, but not necessarily, be

construed as design defect claims," the Court proceeded with the
<u>Scindia</u> analysis while noting "to the extent that [plaintiff's]
allegations are claims for defective design and setup of the
vessel, they are disguised claims of unseaworthiness and not
recoverable under § 905(b)."); <u>see also</u> <u>Bilderbeck</u>, 776 F.2d at
819 (holding without "specific allegations of negligence," the
claim that the ship and crane were negligently designed was "just
an alternative way of saying that the vessel was unseaworthy and
that the unseaworthiness caused the injury" but noting <u>Scindia</u>
left open the question of whether a plaintiff can claim the
"functional equivalent of unseaworthiness" if the hazardous defect
is "negligently created" and "the shipowner knew or reasonably
should have known of the hazard, and nonetheless failed to warn
the stevedore company so that it could take steps to protect its
workmen"); <u>Treadaway v. Societe Anonyme Louis-Dreyfus</u>, 894 F.2d
161, 166 n.24 (5th Cir. 1990) (noting the open question of "whether
a vessel may be held liable for failure to warn of a design defect
that is in its original condition, or whether that would amount to
letting unseaworthiness in through the back door"). Thus, if
Plaintiff's claim is truly a claim that the gangway was defectively
designed, separate from any liability on the part of Defendants,
Defendants are entitled to judgment as a matter of law.

While Defendants rely on Plaintiff's expert's testimony to
construe Plaintiff's cause of action as an incognizable

unseaworthiness claim, it is well-settled that at the summary judgment stage, the plaintiff is still "the master of his or her complaint and may choose" which theory of liability to advance if that theory is supported by the complaint. Yusko v. NCL (Bah.), Ltd., 4 F.4th 1164, 1170 (11th Cir. 2021). Simply because Defendants interpret Plaintiff's expert testimony to support an incognizable design defect claim does not mean summary judgment is warranted if the facts also support a cognizable vessel negligence claim. Dkt. No. 27 at 13 (citing Sweeney Report at 4, Crosson Report at 5).[4]

Plaintiff characterizes his claim as follows: As he descended the gangway, Plaintiff "experienced a change in the *condition* of the gangway step tread, and he slipped on badly worn tread on the gangway and fell towards the bottom of the gangway. He tried to grab hold of something to regain his balance, but [Plaintiff] continued to fall, resulting in injuries." Dkt. No. 42 at 1–2

---

[4] Captain Katherine Sweeney and Mr. Joseph Crosson serve as Plaintiff's expert witnesses. Dkt. Nos. 29-6, 30-1. The Court's ruling on the Daubert motions cabined these experts' testimonies. Dkt. Nos. 64, 70. Mr. Crosson's opinion will include that the "treads on the lower five steps of the gangway exhibited a degree of wear which was inconsistent with the level of wear on the upper portion" and the "treads on the steps of the upper gangway section would offer greater slip resistance as compared to the treads on the lower steps." Dkt. No. 64 at 17–18. The Court's ruling excludes Captain Sweeney's opinions critiquing the design or manufacturing of the gangway, discussing how different handrails would have prevented Plaintiff's fall, and discussing the grip or friction of the gangway. Id. at 37.

(emphasis added); <u>see also</u> Dkt. No. 1-1 ¶ 16. Thus, Plaintiff attributes the fall to the degree of wear on the gangway steps and the failure to keep the rope handline taut at the time of the fall. Dkt. No. 42 at 2, 14.[5] Therefore, Plaintiff's theory of the case sounds in negligence because Plaintiff posits that the vessel's negligent upkeep of the gangway, not a deficient design, led to his fall.

Plaintiff's expert testified that he attributes Plaintiff's fall to the "configuration" of the gangway steps. Dkt. No. 27-7 at 13, 49:1-50:9. Nevertheless, this testimony also discusses the wear and tear of the steps. <u>See</u> Dkt. Nos. 27-7 at 8, 28:24-25, 64 at 7, 17, 70. Thus, summary judgment is improper on the basis of Defendants' design defect argument, and the Court continues through the <u>Scindia</u> analysis, deciding if genuine disputes of material fact underlay this formulation of Plaintiff's vessel negligence claim.

**B. The Contrary Custom Argument is Encompassed by the <u>Scindia</u> Duties.**

---

[5] In the complaint, Plaintiff states that "a piece of the handrail at the bottom of the gangway was out of place" rather than the rope handline being too loose. Dkt. No. 1-1 ¶ 16. The Court finds that the facts revealed by discovery regarding the rope and the positioning of the gangway do not constitute an improper attempt by Plaintiff "to offer a new factual basis for his claims" for the first time in response to Defendants' motion for summary judgment, but rather constitute support for the allegations in Plaintiff's complaint. <u>Mitchell v. Pilgrim's Pride Corp.</u>, 817 F. App'x 701, 708 (11th Cir. 2020).

Recall, the <u>Scindia</u> Court held "[a]bsent contract provision, positive law, or custom to the contrary, the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." <u>Dixon v. NYK Reefers Ltd.</u>, 705 F. App'x 819, 822 (11th Cir. 2017) (quoting <u>Scindia</u>, 451 U.S. at 172) (alterations adopted). Thus, under the custom exception to the general rule, the shipowner may become "by custom obligated to assure the safety of the longshoremen or inspect for dangers growing out of their work." <u>Spence v. Mariehamns R/S</u>, 766 F.2d 1504, 1508 (11th Cir. 1985).

While "custom" is not defined by the Longshore Act or <u>Scindia</u> and its progeny,[6] courts have generally recognized a custom when there are "factual circumstances under which the longshoremen and stevedore may reasonably expect the shipowner to take operational responsibility because the shipowner, or shipowners in general, have done so consistently in the past." <u>Proof of Third Party's Negligence in Action Under the Longshore and Harbor Workers' Compensation Act</u>, 44 Am. Jur. Proof of Facts 2d 147 § 20 (1986). A plaintiff may show that "the vessel customarily monitored cargo

---

[6] Under the "accepted principles of tort law" referenced in <u>Scindia</u>, a custom is what is usually done within a particular industry, group, or organization. <u>Wolf v. Celebrity Cruises, Inc.</u>, 683 F. App'x 786, 789 (11th Cir. 2017); <u>Scindia</u>, 451 U.S. at 166.

operations in order to discover conditions dangerous to longshoremen." Dixon, 705 F. App'x at 825. If it is the custom of the vessel to monitor cargo operations to discover dangerous conditions, the vessel is no longer "entitled to rely on the stevedore to 'perform his task properly without supervision.'" Id. at 826 (quoting Scindia, 451 U.S. at 170). It is not enough to show "it was customary for the vessel's crew to act in a prescribed manner upon notification of a dangerous condition." Id.; see also Lampkin v. Liberia Athene Transp. Co., 823 F.2d 1497, 1500, 1503 (11th Cir. 1987) (affirming the district court's holding that, where the custom "depended upon notification by the stevedore of the dangerous condition," that custom does not impose a general duty on the vessel).

Here, Plaintiff argues it was "the vessel's policy and practice to have a gangway watchman stationed at the top of the gangway throughout the cargo operation to make sure the gangway stays in a safe condition." Dkt. No. 42 at 8. Defendants first respond that a shipowner's internal operating procedures do not trigger the custom exception. Dkt. No. 49 at 7. Second, Defendants argue that Plaintiff's custom argument is subsumed by the turnover duty because the dangerous condition here—the worn tread—existed at turnover. Id. at 8.

The Court finds no binding authority for the sweeping proposition that internal policies can *never* create a custom under

14

<u>Scindia</u> and declines to hold as much. Defendants do not dispute that it is customary for a vessel crewmember to monitor the gangway. Dkt. Nos. 27-5 at 7, 22:9-24, 27-8 at 9, 33:8-24, 42-1 ¶ 20. Nevertheless, Defendants' internal policy and practice to station a gangway watchman does not impose a general duty of supervision and inspection; instead, this practice is subsumed by the three specific <u>Scindia</u> duties.

"Mere presence of the vessel's crew on the ship" does not impose a greater duty on the shipowner, even pre-<u>Scindia</u>. <u>See, e.g.</u>, <u>Stockstill v. Gypsum Transp.</u>, 607 F.2d 1112, 1117 (5th Cir. 1979);[7] <u>Dixon</u>, 705 F. App'x at 823-26 ("[T]he presence of crew members on deck [is] not evidence that the vessel customarily monitored cargo operations in order to discover conditions dangerous to longshoremen."). Indeed, courts routinely hold that even if "a vessel customarily observes the loading of cargo, . . . such observation cannot be used to reimpose the general duty to supervise the stevedore." <u>Derr v. Kawasaki Kisen K.K.</u>, 835 F.2d 490, 494 (3d Cir. 1987); <u>accord</u> <u>Horton v. Maersk Line, Ltd.</u>, No. 4:12-cv-127, 2014 WL 7893191, at *6 (S.D. Ga. Sept. 22, 2014), <u>aff'd</u>, <u>Horton v. Maersk Line, Ltd.</u>, 603 F. App'x 791, 797 (11th Cir. 2015).

---

[7] <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981).

Thus, without more, the record is devoid of facts showing the gangway watchman customarily undertakes a duty—typically assigned to the stevedore—to supervise, inspect, and discover dangerous conditions. There is no evidence the gangway watchman supervised longshoremen or inspected the gangway "for the benefit of longshoremen then on board." Howlett, 512 U.S. at 101. At most, the record shows that "[t]here is a duty AB [("able seaman")] assigned at the gangway watch" who oversees the readjustment of the gangway, dkt. no. 27-8 at 9, 33:8-24, and a declaration from Plaintiff's colleague that "[i]n [his] experience, there is at least one gangway watchman from the ship's crew, who has the job of monitoring, controlling, and inspecting the gangway before it is landed and throughout the entire time it is open for use." Dkt. No. 42-1 ¶ 20. Mere observation of the gangway does not create a general duty of inspection and supervision because to hold as much would "saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b)" of the Longshore Act. Scindia, 451 U.S. at 169 (citation omitted).

Plaintiff's argument is nevertheless relevant even if it does not establish a general, customary duty. See, e.g., Greene v. Cosco Shipping Lines Co. Ltd., 697 F. Supp. 3d 1362, 1374-75 (S.D. Ga. 2023) (finding that there was a genuine issue for trial as to the second Scindia duty, in part, due to the presence of a gangway watchman), modified on other grounds by 2024 WL 4753309 (Nov. 12,

2024). Accordingly, the Court considers the presence of the gangway watchman in the determination of whether Defendants breached one of the three <u>Scindia</u> duties.

### C. **First <u>Scindia</u> Duty: Genuine Disputes of Material Fact Exist as to the Turnover Duty.**

The first <u>Scindia</u> duty, "which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations." <u>Howlett</u>, 512 U.S. at 98 (quoting <u>Scindia</u>, 451 U.S. at 167). The turnover duty has two components: the duty of safe condition and the duty to warn. <u>Troutman v. Seaboard Atl. Ltd.</u>, 958 F.3d 1143, 1147 (11th Cir. 2020) (citing <u>Howlett</u>, 512 U.S. at 98). First, "a shipowner must exercise ordinary care to maintain the ship and its equipment in a condition so that an expert and experienced stevedore can load and unload cargo with reasonable safety." <u>Howlett</u>, 512 U.S. at 93-94. Second, as a corollary, "the shipowner must warn the stevedore of latent hazards." <u>Id.</u> at 94. Latent hazards are ones "that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." <u>Id.</u> at 105 (quoting <u>Scindia</u>, 451 U.S. at 167). Thus, the shipowner has a duty to warn of a dangerous condition that (1) "would likely be encountered by the stevedore in the course of his cargo operations," (2) is "not known to the stevedore," and (3) "would not be obvious to or anticipated by him if reasonably

competent in the performance of his work." Id. at 98 (quoting Scindia, 451 U.S. at 167) (alterations adopted). The focus of this last "factual inquiry is frequently directed at whether experienced longshore workers could complete their work with reasonable safety." Troutman, 958 F.3d at 1146 n.1 (alterations adopted) (internal quotation marks and citation omitted).

"Stated concisely, under these twin duties, before a stevedore begins work, a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety and must warn the stevedore of any hidden dangers of which it knows or should know." Washington v. Nat'l Shipping Co., 374 F. Supp. 3d 1339, 1351 (S.D. Ga. 2019) (internal quotation marks and citation omitted) (alteration adopted), aff'd, 836 F. App'x 846 (11th Cir. 2020). "A breach of the turnover duty must occur at the moment of turnover." Id. at 1354.

Plaintiff argues that because "a gangway does not go from being in good condition to disrepair overnight," the overly worn tread on the stairs existed at turnover. Dkt. No. 42 at 3. Plaintiff also asserts that "the gangway and all its components must be properly rigged by the crew at the beginning" of stevedoring operations. Id. This argument is supported by Plaintiff's expert, Mr. Crosson, who opines that the "treads on the lower five steps of the gangway exhibited a degree of wear which was inconsistent with the level of wear on the upper portion"

18

and the "treads on the steps of the upper gangway section would offer greater slip resistance as compared to the treads on the lower steps." Dkt. No. 64 at 17–18.

1. **The Duty of Safe Condition: Whether There is a Duty to Provide Non-Skid Surfaces.**

Defendants argue that there was no breach of the turnover duty as a matter of law because shipowners do not owe a duty to provide non-skid surfaces under Scindia. Dkt. No. 27 at 3. The authority upon which Defendants rely holds that non-skid surfaces are not a latent hazard, which goes to the open and obvious defense and the duty to warn. Dias v. TMS Seacod GmbH & Co., 84 F. Supp. 3d 107, 111 (D.R.I. 2015) (A slick, wet, and metal deck and the "absence of a non-skid surface" is not a hidden hazard); Thompson v. Cargill, Inc., 585 F. Supp. 1332, 1334 (E.D. La. 1984) (The "lack of a non-skid surface" on the deck of the vessel where the plaintiff slipped "was not a hidden condition."); Davis v. Pan Ocean Shipping Co., No. CIV.A.96-6103, 1999 WL 144095, at *5 (E.D. Pa. Mar. 15, 1999) (rejecting the argument that a "non-skid surface by itself is a non-obvious hazard that warrants liability, absent some evidence that the defendant should have known that such a non-skid surface created the risk of accidents and that an experienced stevedore never would have worked on such a non-skid

surface.").[8] These cases are distinguishable because Plaintiff's argument is about the wear of the stairs, rather than a non-skid design on a wet, slick deck. See generally Dkt. No. 42. These cases' holdings that a wet, slick deck is not a latent hazard do not absolve the vessel of its duty to provide a safe gangway at turnover. Therefore, the law does not support a broad holding that the vessel had no duty to upkeep the gangway prior to turnover in this case.

### 2. The Turnover Duty: Whether the Condition was Open and Obvious

Next, Defendants argue that the condition of the gangway was open and obvious. The Eleventh Circuit in Troutman expressly endorsed an open-and-obvious defense to a breach of the turnover duty. 958 F.3d at 1146. Under this rule, "a shipowner does not breach this duty when the injurious hazard was open and obvious and could have been avoided by a reasonably competent stevedore." Id. That the hazard was open and obvious is an affirmative defense to a breach of the turnover duty, but that defense is "not absolute." Id.

---

[8] Defendants also cite Hampton v. Broadway Maritime Shipping Co., Ltd., No. C-96-0464 SI, 1997 WL 102500, at *3-4 (N.D. Cal. Feb. 25, 1997), in which the plaintiff argued "the rungs [of a ladder] were worn down to the point that the ladder lacked sufficient non-skid properties to be safely used." In that case, however, the court did not rule on whether such a condition would constitute a latent hazard but rather determined the only testimony supporting it was unsupported by scientific method and thus inadmissible.

It is undisputed that Plaintiff ascended the gangway once prior to the fall and did not notice any issues with the rigging, the tread, or the tautness of the rope. Dkt. No. 43 ¶¶ 6-7. It is also undisputed that the fall occurred when it was light outside at approximately 8:00am. Dkt. No. 59-1 at 1-2. Defendants argue that "[e]very expert has opined about these treads simply by looking at photographs of them," and thus, the worn treads were readily visible. Dkt. No. 27 at 24. Even so, an expert's close examination of photos is not the same as a longshoreman's visual observation on the job. See Dkt. No. 27-6 at 20, 74:10-20.

Further, Plaintiff submits a declaration from another longshoreman, who was behind Plaintiff at the time of the fall, stating the "condition of the worn treads was not obvious to [him] before a close inspection after-the-fact." Dkt. No. 42-1 ¶ 10. Therefore, the testimony of the other longshoreman behind Plaintiff at the time of the fall creates a genuine issue for trial as to whether the condition of the gangway was open and obvious. See, e.g., Bass v. M/V Star Isfjord, No. 1:20-cv-7, 2022 WL 4543684, at *6 (S.D. Ala. Sep. 28, 2022) (holding genuine disputes of material fact existed about the open and obvious nature of the hazard).

**3. The Turnover Duty: Whether the Condition Could Have Been Avoided by a Reasonably Competent Stevedore.**

The open-and-obvious defense requires more than just the hazard being open and obvious; it also requires the hazard to be avoidable by a reasonably competent stevedore. <u>Troutman</u>, 958 F.3d at 1146. In other words, even if there were no disputes of material fact that the worn gangway tread was open and obvious, "the question of negligence" nevertheless "boils down to whether 'an expert and experienced stevedore'—rather than an 'unskilled person'—could safely avoid the hazard." <u>Id.</u> at 1146–47 (quoting <u>Bjaranson v. Botelho Shipping Corp., Manila</u>, 873 F.2d 1204, 1207 (9th Cir. 1989)). There is no breach of the turnover duty if Plaintiff acted unreasonably towards an open and obvious hazard because the Longshore Act "assumes the ability of 'an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, to carry on cargo operations with reasonable safety to persons and property.'" <u>Id.</u> at 1147 (quoting <u>Howlett</u>, 512 U.S. at 98) (alterations adopted).

First, Plaintiff argues that the open-and-obvious principle does not apply "if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job." Dkt. No. 42 at 18 (quoting <u>Moore v. M/V Angela</u>, 353 F.3d 376, 381 (5th Cir. 2003)). In other words, there is an impracticability exception to the open and obvious defense to the vessel's turnover duty if the hazard was practically unavoidable. <u>See</u> <u>id.</u> The only other district court in the Eleventh

Circuit to squarely address the issue declined to recognize this impracticability exception. In re M/V Seaboard Spirit Seaboard Spirit, No. 1:11-CV-23841, 2015 WL 1725915, at *10 (S.D. Fla. Apr. 15, 2015) (noting "neither the Eleventh Circuit nor the Supreme Court[] have held that this 'open and obvious' exception to the vessel owner's duty does not apply 'if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming and would force him to leave the job'"), rev'd on other grounds by Seaboard Spirit Ltd. v. Hyman, 672 F. App'x 935 (11th Cir. 2016).

But this impracticability doctrine has its roots in pre-Scindia Fifth Circuit caselaw. See, e.g., Moore, 353 F.3d at 381 (citing Treadaway, 894 F.2d at 167); Treadaway, 894 F.2d at 167 n.30 (citing Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A., 832 F.2d 67, 71 (5th Cir. 1987)); Morris, 832 F.2d at 71 ("As Pluyer demonstrates, the longshoreman need not show that he had no possible alternative but to use defective equipment or to work in a dangerous area. The burden is not so heavy. He need show only that the circumstances made safer alternatives unduly impractical or time-consuming." (citing Pluyer v. Mitsui O.S.K. Lines, Ltd., 664 F.2d 1243, 1247–48 (5th Cir. Unit A 1982))); Pluyer, 664 F.2d at 1247 (concluding that Scindia "did not change the law in this circuit" regarding the standard for "unavoidable" hazards and noting that "[s]ince [its] decision in Gay v. Ocean Transport &

Trading, Ltd., 546 F.2d 1233, 1242 (5th Cir. 1977), [the Fifth Circuit] ha[s] recognized that recovery for personal injuries by longshoremen encountering open and obvious dangers is allowed where the danger 'must be faced notwithstanding knowledge'" (citation modified) (citing Walker v. Blacksea S.S. Co., 637 F.2d 287, 291 (5th Cir. Unit A Feb. 1981)). The Eleventh Circuit, sitting en banc, has not overruled this line of cases. See Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001) ("Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."). Therefore, it is proper to consider whether Plaintiff's use of the allegedly unsafe gangway was unavoidable under this part of the turnover duty.

Second, and notwithstanding whether the Court adopts the impracticability doctrine, there are factual disputes about whether Plaintiff acted as a reasonably competent longshoreman. Defendants present evidence and testimony that Plaintiff was "jogging" at the time of the fall. See Dkt. No. 27-5 at 13, 45:14–16. Plaintiff presents an eyewitness-longshoreman's declaration, stating that Plaintiff "was moving at a safe speed" at the time of the fall. Dkt. No. 42-1 ¶ 15.

There are two videos of the fall. Dkt. Nos. 27-2, 71. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). "For that reason, when an incident is recorded and the video 'obviously contradicts' the plaintiff's version of events, courts will accept the video's depiction of the events as controlling." Buckman v. Morris, 736 F. App'x 852, 853 (11th Cir. 2018) (quoting Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010)) (citing Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013)).

On one hand, the videos show Plaintiff moving quickly. See Dkt. Nos. 27-2, 71. On the other hand, it is not obvious that Plaintiff was running or jogging down the gangway at the time of the fall. See Dkt. Nos. 27-2, 71. Indeed, the videos corroborate the eyewitness-longshoreman's statement—that is, "[t]he way [Plaintiff] was using the gangway is consistent with the way [the other longshoreman has] done throughout [his] career," dkt. no. 42-1 ¶ 14—because the videos show the two longshoremen moving at approximately the same rate of speed before Plaintiff's fall. See Dkt. Nos. 27-2, 71. Therefore, the videos do not "obviously" contradict Plaintiff's version of events. See Pourmoghani-Esfahani, 625 F.3d at 1315.

On the record before the Court, it cannot be said, as a matter of law, that the gangway could have been safely traversed by a reasonably competent longshoreman. Accordingly, Defendants are not absolved of liability under the turnover duty because there are factual disputes about whether the injurious hazard was "open and obvious" and "could have been avoided by a reasonably competent stevedore." Troutman, 958 F.3d at 1146.

### 4. The Turnover Duty: The Duty of Safe Condition & Duty to Warn

Contrarily, where the hazard was not open and obvious, Plaintiff must show a breach of the duty of safe condition and the duty to warn as well as causation and damages. Id. at 1147. First, a shipowner breaches the duty of safe condition when it does not "turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety." Washington, 374 F. Supp. 3d at 1351. Here, factual disputes exist as to whether the gangway was turned over in a safe condition. On one side, Plaintiff's expert will testify that the "treads on the lower five steps of the gangway exhibited a degree of wear which was inconsistent with the level of wear on the upper portion." Dkt. No. 64 at 17–18. On the other, Defendants present evidence that the gangway was not in disrepair, and the gangway passed inspection

just a month after this incident. Dkt. No. 27-9.[9] Therefore, there is a genuine question of fact about the degree of wear on the lower steps and, thus, a triable issue on the breach element.

Further, Plaintiff's expert testimony and the videos of the fall constitute evidence of causation, connecting the location of the worn tread to the place of the fall. Dkt. Nos. 27-2, 27-7, 64 at 17-18. It is undisputed that Plaintiff fell and suffered injuries. See generally Dkt. Nos. 27-2, 27-3, 71. Thus, Plaintiff has presented sufficient evidence from which a factfinder may conclude that Defendants did not turn over the ship in a safe condition, and summary judgment on Plaintiff's claim for breach of the turnover duty is improper.

Plaintiff also presents evidence of Defendants' breach of the corollary duty to warn. "[T]he shipowner has a duty to warn of a dangerous condition that (1) would likely be encountered by the stevedore in the course of his cargo operations, (2) is not known to the stevedore, and (3) would not be obvious to or anticipated

---

[9] It is important to note that the defense expert's testimony about this inspection was excluded. Dkt. No. 64 at 36. The Magistrate Judge explained, "This case involves the condition of the gangway on October 9, 2022, not some time in November of that year. The gangway could have been in a significantly different condition by the time it was inspected, and Defendants provide no evidence that the gangway was unchanged in the intervening period." Id. (internal record citations omitted). Nevertheless, the Court has not ruled that the inspection report is inadmissible, and Defendants may argue that the gangway was not in disrepair by simply using photographs of the gangway.

by him if reasonably competent in the performance of his work."
Howlett, 512 U.S. at 98 (internal quotation marks and citation
omitted).

There are factual disputes about whether the worn tread was
latent. First, the gangway is the only way to board the ship, and
thus is likely to be encountered. See Dkt. Nos. 42-1 ¶¶ 6, 16–17
(Plaintiff could not have "avoided encountering this gangway short
of stopping the work or causing serious delays."), 43 ¶ 12 (The
gangway was the only "means of embarking or disembarking the
vessel."). Second, Plaintiff presents evidence to dispute
Defendants' contention that he would have seen the worn tread when
he ascended the gangway. Dkt. No. 42-1 ¶ 11 (The condition of the
worn treads was not visible to the other longshoremen until "a
close inspection after-the-fact."). Third, Plaintiff presents
evidence that he was reasonably competent and did not discover the
worn tread. See id. ¶ 14 ("The way [Plaintiff] was using the
gangway is consistent with the way [the other experienced
longshoreman has] done throughout [his] career. [He] saw nothing
unsafe that [Plaintiff] did, and [he] was right behind [Plaintiff]"
when Plaintiff fell.). It is undisputed that the vessel's crew did
not warn the stevedore or its longshoremen of the worn treads. See
id. ¶ 21; see generally Dkt. Nos. 27, 42, 49, 59. Therefore,
Defendants are not entitled to judgment as a matter of law as to

28

the first _Scindia_ duty. Their motion for summary judgment is therefore **DENIED** as to this issue.[10]

### D. Second _Scindia_ Duty: There are not Genuine Disputes of Material Fact as to the Active Control Duty.

"The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" _Howlett_, 512 U.S. at 98 (quoting _Scindia_, 451 U.S. at 167). To trigger the active control duty, "a plaintiff must show that the vessel owner 'substantially controlled or was in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [stevedore] undertook.'" _Washington_, 374 F. Supp. 3d at 1357; _Green v. United States_, 700 F. Supp. 2d

---

[10] In addition to the gangway treads, Plaintiff also points to the loose rope handline as an unsafe condition at turnover. _See_ Dkt. No. 42 at 15–19. However, "[a] breach of the turnover duty _must_ occur at the moment of turnover." _Washington_, 374 F. Supp. 3d at 1354 (emphasis added). Plaintiff's contention that the gangway was improperly rigged "without a properly adjusted handrail and rope" before stevedoring operations commenced is wholly unsupported by the record. Dkt. No. 42 at 14. Plaintiff has presented no evidence of the position of the rope at turnover. Indeed, the record reflects only that the rope was not taut at the time of Plaintiff's fall, well after turnover occurred. Dkt. No. 42-1 ¶ 12. Therefore, the Court can only speculate about when and why the rope became loose. _See Cordoba v. Dillard's Inc._, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Thus, the Court holds the allegedly hazardous rope handline cannot underlie a breach of the turnover duty.

1280, 1303 (M.D. Fla. 2010) (same). The shipowner violates the active control duty if (1) it "actively involves itself in the cargo operations and negligently injures a longshoreman" or (2) "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Lampkin, 823 F.2d at 1501 (quoting Scindia, 451 U.S. at 168).

The only dangerous condition that potentially implicates the active control duty is the tautness of the rope handline because the record does not show it was loose at turnover. See Dkt. No. 42-2 at 20:16–22:23 (explaining that the stevedore does not board the vessel until the gangway is rigged and inspected). Defendants assert that the active-control duty claim fails as a matter of law because (1) the active control duty is not triggered here and (2) no competent testimony or evidence causally links the tautness of the rope to Plaintiff's alleged injury.

First, factual disputes exist as to whether the vessel, as opposed to the stevedore, had control of the gangway. See Greene, 697 F. Supp. 3d at 1375 (collecting cases holding that the "maintenance of the gangway falls within a vessel's control"). Defendants argue that unlike cases where the crewmembers improperly rig the gangway, here, the crewmembers' role was "limited to standing watch at the top of the gangway and monitoring

those who board and depart the vessel." Dkt. No. 49 at 9. The record belies this argument because the defense expert testified that "[t]he gangway is rigged and deployed by the vessel crew." Dkt. No. 27-5 at 22, 7:2-9. Defendants' 30(b)(6) witness also testified that the vessel's crew rigged the gangway and the stevedore may not board the vessel until the crew rigs the gangway. Dkt. No. 27-8 at 5-6, 20:16-21:8, 22:24-23:10. Once stevedoring operations commenced, the record shows that "[t]here is a duty [able seaman] assigned at the gangway watch" who oversees the readjustment of the gangway, dkt. nos. 27-8 at 9, 33:8-19, 42-1 ¶ 20, and it is "only the vessel's crew" who "actually operate the gangway," dkt. nos. 27-8 at 9, 33:20-24. Therefore, the evidence in this case is sufficient to overcome summary judgment as to the first part of the active control duty—whether the gangway was, in fact, under the vessel's active control.

Nevertheless, the active control duty is merely triggered by this evidence; Plaintiff must still show breach, causation, and damages. Willis, 77 F.4th at 1336. The shipowner violates the active control duty if (1) it "actively involves itself in the cargo operations and negligently injures a longshoreman" or (2) "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Lampkin, 823 F.2d at 1501.

31

A breach of the active control duty "requires" the vessel to have "constructive, and not actual, knowledge of the hazard." Id. at 1502; see also Chapman v. Bizet Shipping, S.A., 936 F. Supp. 982, 986 (S.D. Ga. 1996) ("The second duty, or active operations duty, applies only when the shipowner has constructive knowledge of the potential danger." (quoting Lampkin, 823 F.2d at 1501)); Mosley v. Ceres Marine Terminals, Inc., 576 F. Supp. 3d 1358, 1368 (S.D. Ga. 2021) ("If the vessel is actively involved in operations or actively controls the area, the shipowner may be held liable if it has constructive knowledge of a hazard." (internal quotation marks and citation omitted)). "A maritime plaintiff can establish constructive notice with evidence that the defective condition existed for a sufficient period of time to invite corrective measures." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 721 (11th Cir. 2019) (internal quotation marks and citation omitted) (alteration adopted). Additionally, "a plaintiff can establish constructive notice with evidence of substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." Id. (internal quotation marks and citation omitted).[11]

---

[11] Although Guevara is not a Longshore Act case, these methods of proof mirror the "accepted principles of tort law" that the Court must apply here. Scindia, 451 U.S. at 166; see also Paul M. Coltoff, et. al, 62A Am. Jur. 2d Premises Liability § 475 ("In the absence of a showing of actual notice, it is necessary to demonstrate, in order to establish that the owner had constructive

Plaintiff testified that "when [he] fell, there was no rail to grab or no rope to grab." Dkt. No. 27-3 at 8, 31:8-9. Plaintiff also testified that this gangway was atypical because it had a "missing or improperly secured rope." Id. at 17, 66:21-67:14. The eyewitness-longshoreman also stated, "On the way down, [Plaintiff] tried grabbing the rope which should extend to the bottom, but it was too loose for him to grab as support, and so the fall continued where it appeared his leg twisted." Dkt. No. 42-1 ¶ 12. One of the videos shows that Plaintiff fell at the very end of the metal handrail and the beginning of the rope handline. Dkt. No. 27-2 at 0:05-0:06.

However, there is no evidence in the record establishing that the gangway watchman had actual or constructive knowledge that the rope had become loose. The rope is at the bottom of the gangway; the watchman is at the top. Dkt. No. 27-3 at 16, 64:14-22. While there is evidence that, generally, the "[r]opes must be kept taut," dkt. no. 42-4 at 22, and the crew inspects the ropes before boarding, dkt. no. 42-2 at 20:19-22:23, there is no evidence regarding how the gangway watchman would become aware that a rope handline had become loose. To the contrary, there is record

---

notice of the dangerous condition, that the condition had existed for a sufficient length of time prior to the injury . . . ." (internal footnote and citation omitted)).

evidence that one could not see "the loose rope at the bottom" while coming down from the vessel. Dkt. No. 42-1 ¶ 21.

Moreover, the record is devoid of any evidence demonstrating when the rope became loose, how long it remained loose, and with what frequency the gangway watchman could have observed the lack of tautness. The Court can only speculate about whether the gangway watchman should have known the rope was not taut; it is well-settled that "speculation about a fact or result is insufficient to survive summary judgment." Gadsby v. Am. Golf Corp. of Cal., 557 F. App'x 837, 840 (11th Cir. 2014) (per curiam). In the absence of any evidence from which a reasonable jury could impute constructive knowledge on the vessel, there is no breach of the active control duty. Lampkin, 823 F.2d at 1501. Therefore, Defendants are entitled to judgment as a matter of law on the second Scindia duty, and their motion for summary judgment is **GRANTED** in this respect.

### E. Third Scindia Duty: Genuine Disputes of Material Fact do not Exist as to the Duty to Intervene.

"The third duty, called the 'duty to intervene,' concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." Howlett, 512 U.S. at 98 (citing Scindia, 451 U.S. at 167–78). Under the duty to intervene, "if the shipowner learns of an apparently dangerous condition that presents an unreasonable risk or harm to the

longshoremen, it has a duty to intervene and remove the hazard." Lampkin, 823 F.2d at 1501. "Where cargo operations have begun and the shipowner is not actively involved, it must have actual knowledge of the hazard before it may be held liable." Id. "In such a case, the shipowner has a duty to intervene to protect the longshoremen only if 'it becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen.'" Id. (quoting Clark v. Bothelho Shipping Corp., 784 F.2d 1563, 1565 (11th Cir. 1986)). The Eleventh Circuit characterizes this duty as "*very limited.*" Hunter v. Reardon Smith Lines, Ltd., 719 F.2d 1108, 1112 (11th Cir. 1983) (emphasis in original) (citing Scindia, 451 U.S. at 175–76).

Again, because the worn tread was a condition that existed at turnover, the only dangerous condition that implicates the duty to intervene is the tautness of the rope handline. The duty to intervene requires actual knowledge. Lampkin, 823 F.2d at 1501. The record is devoid of evidence that the watchman actually saw the rope come loose after rigging. Thus, there is no evidence in the record that the crewmembers became "aware that the ship or its gear pose[d] a danger to the longshoremen and that the stevedore [failed] unreasonably, to protect the longshoremen." Id. That there was a gangway watchman, without more, does not mean that the watchman or any member of the vessel's crew observed the loose

rope handline. Thus, Plaintiff has not "set forth specific facts showing that there is a genuine issue for trial." Walker, 911 F.2d at 1576–77.

In short, the duty to intervene is wholly unsupported by the record because there is no testimony or evidence that the gangway watchman saw the loose rope or observed anything to indicate that the stevedore was unreasonably failing to protect its longshoremen. Thus, there are no triable issues as to this limited duty. Therefore, Defendants are entitled to judgment as a matter of law on the third Scindia duty, and their motion for summary judgment as to this issue is **GRANTED**.

### CONCLUSION

Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. The motion is **DENIED** as to Defendants' argument that Plaintiff's negligence claim—based on the gangway's degree of wear—is an incognizable unseaworthiness claim. Further, the motion is **DENIED** as to Plaintiff's contention that Defendants breached the first Scindia duty, the turnover duty. Genuine issues of material fact exist as to Defendants' breach of this duty and Defendants' open-and-obvious defense.

However, Defendants' motion is **GRANTED** as to Plaintiff's contention that Defendants breached a general duty imposed by custom. The motion is also **GRANTED** as to the second and third Scindia duties, the active control duty and the duty to intervene.

36

There are no genuine disputes of material fact to support these avenues of relief because there is not a scintilla of evidence to show Defendants' constructive or actual knowledge of the loose rope handline.

Accordingly, the Parties are **ORDERED** to file a proposed consolidated pretrial order within **21 days** of the date of this Order.

**SO ORDERED** this 1st day of July, 2025.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA